RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2001 FED App. 0110P (6th Cir.)
File Name: 01a0110p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

FRANCES BUXTON,
        *Plaintiff-Appellant,*

        *v.*

WILLIAM A. HALTER,
Commissioner of Social
Security,
        *Defendant-Appellee.*

No. 00-3429

Appeal from the United States District Court
for the Northern District of Ohio at Cleveland.
No. 99-00762—Ann Aldrich, District Judge.

Submitted: March 14, 2001

Decided and Filed: April 12, 2001

Before: COLE and GILMAN, Circuit Judges; BORMAN,
District Judge.

_____

*The Honorable Paul D. Borman, United States District Judge for the
Eastern District of Michigan, sitting by designation.

1

---

**COUNSEL**

**ON BRIEF:**   Lester S. Potash, Cleveland, Ohio, for Appellant.  Michael Anne Johnson, ASSISTANT UNITED STATES ATTORNEY, Cleveland, Ohio, for Appellee.

---

**OPINION**

---

BORMAN, District Judge.   Plaintiff appeals from the district court's grant of judgment in favor of the Commissioner of Social Security.  The issue presented in this case is whether there exists in the record substantial evidence to support the Commissioner of Social Security's determination that Frances Buxton is not entitled to disability benefits because she is not completely disabled from either physical or mental impairments.  For the reasons that follow, we will **AFFIRM** the decision of the district court.

## I.  BACKGROUND

### A.  Procedural Background

Frances Buxton filed an application for Social Security disability benefits on August 2, 1993.  Buxton alleged she was disabled by fatigue, weakness, and chemical sensitivity, with a disability onset date of March 12, 1993.  Buxton's application was denied initially, and upon reconsideration, by the Regional Commissioner, Paul Barnes.  Buxton then requested, and received, a hearing before an Administrative Law Judge ("ALJ").

At the hearing, Buxton was represented by counsel, and testified on her own behalf.  Robert Mosley, a vocational expert, also testified at the hearing.  The ALJ issued a decision finding Buxton not disabled.  Buxton requested that

the Appeals Council review the decision: that request was denied.

Buxton then filed a timely complaint in the district court seeking review of the ALJ's decision. Buxton and the Commissioner, thereafter, stipulated to a remand to the ALJ due to an inconsistency in the ALJ's decision regarding whether Buxton suffers from chronic fatigue syndrome. The ALJ then conducted a second hearing.

At the second hearing, Buxton was represented by counsel, but did not testify on her own behalf. A vocational expert (Carol Mosley) and two medical advisors (Drs. Cox and Schweid) testified at the hearing. The ALJ then found that although Buxton suffers from "severe impairments consisting of chronic fatigue syndrome, chemical sensitivity syndrome, depression, and somatoform disorder,"[1] the impairments did

---

[1] Chronic Fatigue Syndrome ("CFS") is recognized by the Center for Disease Control ("CDC") as a disease. It is diagnosed mainly through a process of elimination, when a physician is unable medically to pinpoint the cause(s) of a patient's symptoms (such as fatigue, weakness, pain, etc.).

Chemical Sensitivity Syndrome ("CSS") is apparently not currently recognized by the CDC as a disease. The working definition in this case is basically allergic reactions to various chemicals which occur with some frequency in our everyday lives.

Depression is a mental disorder found in the Affective Disorders section of the Listing of Impairments at 12.04. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1 (12.04).

Somatoform Disorder is a mental disorder found in the Listing of Impairments at 12.07, and is characterized by "physical symptoms for which there are no demonstrable organic findings or known physiological mechanisms." These physical symptoms may cause the individual "to take medicine frequently, see a physician often and alter life patterns significantly." The individual may have an "[u]nrealistic interpretation of physical signs or sensations associated with the preoccupation or belief that one has a serious disease or injury;" and may show "[m]arked restriction of activities of daily living[,] [m]arked difficulties in maintaining social functioning[,] [d]eficiencies of concentration, persistence or pace resulting in frequent failure to complete tasks in a timely manner (in work settings or elsewhere)[,] or [r]epeated episodes of deterioration or decompensation in work or work-like settings which

not render her disabled. Buxton again requested review of the decision by the Appeals Council: that request was again denied. At that point, the ALJ's decision became the final decision of the Commissioner.

Buxton then filed the instant action in the district court. The magistrate judge issued a report and recommendation ("R&R"), recommending that the Commissioner's decision to deny benefits be affirmed. Buxton timely filed her objections. The district court judge, after considering the R&R as well as Buxton's objections, issued an order accepting the R&R, and entered judgment for the Commissioner.

Buxton filed a timely notice of appeal.

### B. Factual Background

Frances Buxton is presently 51 years old, and was 49 years old at the time of the ALJ's decision. She completed high school, and attended one year of college. She is divorced and has two grown sons. Her past relevant work was as a secretary/office worker/coordinator. She was employed by Nestle Foods (previously Stouffer Foods Corp.), from approximately 1967 until March 2, 1993.

Buxton alleges a disability onset date of March 2, 1993, the day her employment at Nestle ceased. Buxton alleges that she stopped working due to chronic fatigue syndrome and multiple chemical sensitivities. Buxton was granted a period of disability benefits from her employer's disability insurer, based on a finding that Buxton suffered from depression.

---

cause the individual to withdraw from that situation or to experience exacerbation of signs and symptoms (which may include deterioration of adaptive behavior)." *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1 (12.07).

those cases had regarding the nature of their disabilities and thus, their limitations.

### III. CONCLUSION

The ALJ had the enormous task of making sense of the record, reconciling conflicting medical opinions and evidence, and weighing the credibility of Buxton's subjective complaints. There is substantial evidence in the record to support the decision that Buxton retained the residual functional capacity, despite severe impairments, to perform work in the economy. Thus, the district court decision upholding the determination of the ALJ that Buxton is not disabled within the meaning of the Social Security Act is **AFFIRMED**.

Buxton's underlying *physical* conditions, which Dr. Bielefeld, as a psychologist, was not qualified to diagnose.

Buxton's own accounts of her activities and limitations were also conflicting. For instance, she shops for herself, does light cleaning, cooks for herself, drives herself places (including numerous doctors' visits), and exercises daily (thirty minutes of walking without post-exertional collapse), but cannot work. *See supra* Background Part I.B.1. and I.B.2.b. She wrote to the ALJ that she would do well in a controlled environment, but then stated that even a office environment would send her into fits. *See supra* Background Part I.B.1. Under *Duncan*, the ALJ had a herculean task of reconciling these claims with the available medical evidence. His conclusions regarding her credibility are entitled to deference.

The ALJ could properly rely, in this case, on the testimony of Drs. Cox and Schweid, the non-examining medical expert physicians, in order to make sense of the record. What those two experts did, in essence, was to add two more impairments to Buxton's list (i.e., the mental impairments of depression and somatoform disorder), and assist the ALJ in evaluating whether Buxton's subjective complaints of her pain and/or limitations would pass muster under the *Duncan* standard, *supra*. What the ALJ concluded, of course, was that the medical evidence available, although supporting findings of impairments, did not support, under the second prong of *Duncan*, the limitations Buxton allegedly suffered. That finding is entitled to deference.

We note, in passing, that this case is not like most other CFS cases, in that Buxton here is not arguing that the ALJ failed to consider her exertional limitations, such as her fatigue, etc. This distinguishes this case, for example, from *Cohen, supra*, and the First and Ninth Circuit opinions. Those cases are further distinguishable, however, on the basis of the treating physician testimony, because here, we do not have anything as concrete and unequivocal as the claimants in

### 1. Buxton's Self-Described Condition(s)

At the initial hearing before the ALJ in February of 1996, Buxton described her symptoms: bladder/urethra pain; fibromyalgia pain in her back, shoulders, knees, legs; aching/numbness/tingling in hands and legs; headaches; skin rashes; disorientation; depression. Buxton has never been hospitalized for any of her disorders. Buxton described a normal day as arising between 9 and 10 am, feeling weak and having to lie still for awhile; getting up and making herself tea and a light breakfast, and sitting/reading while she eats; taking a bath at 11 am; lying down to rest for 15 minutes after the bath because of exhaustion; depending on how she feels, then reading a book, or trying to dust or vacuum; making herself lunch/dinner. Sometimes she drives locally, but freeways bother her condition. She goes out for dinner occasionally, but cannot stay long depending on the amount of chemicals at the restaurant. She can sometimes read newspapers briefly.

As part of her application for disability benefits, Buxton filled out a Disability Report.[2] On that report, Buxton indicated that she cooked for herself and her son; shopped often because she could not tolerate being in stores for a long period of time and could not carry many bags; could no longer handle yard maintenance. She further indicated her hobbies were walking and reading, and that she could drive her car. She indicated that she did some visiting with friends and relatives, but came home when she began feeling tired. Buxton expressed her opinion regarding the causal connection between her sensitivity to multiple chemicals, and her chronic fatigue: "I have fatigue, weakness & suffer from many symptoms when exposed to any chemical. The fatigue will come & go, nothing consistent."

---

[2] There is an interviewer/reviewer signature on the last page of the Disability Report which may indicate that these answers were transcribed, rather than being Buxton's handwritten answers. However, either way, they can clearly be attributed to her.

Buxton also filled out a Reconsideration Disability Report in connection with her application for benefits.[3]   In it, she summarized her complaints as follows: "To summarize: I can't go anywhere, stay anywhere for any length of time without reacting to some chemical or becoming tired. I stay home a lot."

In a letter addressed to the ALJ, dated August, 1998, which was introduced at the second hearing in lieu of her appearance, Buxton again described her ailments. For instance, Buxton explained:

HHV6 showed up very high for me. . . .  HHV6 is one of the viruses believed to cause CFIDS (Chronic Fatigue Immune Dysfunction).  I was very ill with flu symptoms for a very long time. . . . I no longer have flu-like symptoms.  What I *am* left with is immune system dysfunction.  My immune system overreacts to foods, dust, pollens, molds, trees, grass etc. but most severely to chemicals.  Even minute amounts can cause me to have debilitating reactions.    There are many & varied symptoms:  confusion,  memory loss,  dizziness, depression, crying, fibromyalgia, weakness, headaches, earaches, burning in all my orifices (throat, nose, up my urethra to my bladder[)].

Buxton further opined that it was her chemical sensitivities which caused some of her cognitive symptoms:

With all due respect to the vocational expert, even a small office (such as an insurance agency) could be disasterous [sic] to me.  Paint, carpeting, perfume, hair spray, cleaning products, insecticide, copy machines, etc. will cause severe reactions for me.  I would be so confused, irritable, forgetful, sick & in pain that no employer would want me.

---

[3] *See supra* n.2.

---

numerous ailments, is disabled, as defined by the Social Security Act, when the available evidence indicates that the plaintiff is, in fact, not physically disabled, and is only limited by her own mistaken beliefs regarding her physical condition.  This Court holds that in such a situation, a plaintiff is not per se disabled.  This is not to say that a plaintiff cannot be considered disabled under such a scenario, merely that a plaintiff is not automatically considered disabled as a matter of law under such a scenario.  Thus, the Administrative Law Judge's ("ALJ") decision that Buxton was not disabled, on the basis of a factual record giving rise to such a scenario, was not error as a matter of law and will not be reversed by this Court.

*Buxton v. Apfel*, No. 5:99CV762, slip op. at 1-2 (N.D. Ohio Feb. 23, 2000).

Although it is clear that Buxton suffers from severe ailments, which the ALJ and the district court acknowledged, there was conflicting evidence as to how those ailments related to her disability.

First, there were conflicting opinions from Buxton's own treating physicians as to exactly how Buxton's ailments affected her, and what limitations she had.  For instance, Dr. Kratche, Buxton's primary treating physician, opined that Buxton was under *no* limitations.  *See supra* Background Part I.B.2.a.  Dr. Salata opined that Buxton had no physical limitations, and only "somewhat limited" mental limitations. *See supra* Background Part I.B.2.d.  Dr. Frank opined that Buxton's physical findings could not fully account for her subjective complaints/symptoms. *See supra* Background Part I.B.2.b. Dr. Gordon opined that Buxton's urethral condition was not disabling.  *See supra* Background Part I.B.2.g. Dr. Deorio was the only physician to opine that Buxton was "unable to perform [at] a functional level of output."  *See supra* Background Part I.B.2.f.  Although Dr. Bielefeld did opine that Buxton could not maintain employment (*see supra* Background Part I.B.2.e.), that opinion was based on

The Ninth Circuit found that the ALJ's decision to deny benefits on these bases was unsupported by the record, because the ALJ failed to give legitimate reasons for discrediting the claimant's testimony and the opinions of both of her physicians, and failed to consider the impact of claimant's fatigue on her ability to engage in work. *Id.* at 722, 725, 729.

In 1992, the Sixth Circuit had occasion to decide a social security disability claim based on chronic fatigue syndrome. In *Cohen v. Secretary of Health & Human Servs.*, 964 F.2d 524, 526 (6th Cir. 1992), the claimant had been diagnosed with chronic fatigue syndrome, and suffered a panoply of documented maladies. Two of her treating physicians had noted the extremity of the claimant's afflictions, and expressed doubt as to whether the claimant would be able to work again. *Id.* at 526. The ALJ found that claimant's level of activity (she attended law school part-time, was attempting to continue her ballroom dancing, etc.) substantially undermined her credibility regarding her limitations. *Id.* at 528. The court acknowledged that although it was "a close case," *id.* at 531, that the ALJ had failed to give due consideration to the conclusions and opinions of the claimant's treating physicians, and claimant's own testimony, regarding the limitations imposed by her disease. *Id.* at 529-31. The court found that the evidence relied upon by the ALJ did not constitute substantial evidence, and remanded the case to the district court with instructions to award benefits to the claimant. *Id.* at 532.

In the instant case, the only issue before this court is whether there exists substantial evidence in the record to support the ALJ's determination that Buxton is not disabled within the meaning of the Social Security Act.

The district court, in accepting the magistrate judge's recommendation that the ALJ should be affirmed, stated:

This case presents a fairly narrow issue for this Court to decide. The question is whether a plaintiff, who sincerely believes that she is disabled and suffering from

When I am in a comfortable, controlled area, I am a different person. I can take care of myself. I am happy then and have a good, positive attitude.

### 2.  The Medical Evidence

### a.  Treating Physician, Dr. Kratche

Family practitioner Dr. Robert Kratche first treated Buxton from late 1991 to late 1992. In response to a question regarding Buxton's limitations to do work-related activities, Dr. Kratche wrote: "In my opinion, Fran Buxton is fully capable of performing any and all activities delineated above. She is bright and articulate and has no demonstrable physical disability." Dr. Kratche directed the reader's attention to his patient notes for July 15, 1992 and August 5, 1992. Dr. Kratche's note on July 15, 1992 reads as follows:

S:  Patient is a 43 year old white female who presents quite upset with a complaint of 3 year history of chronic fatigue. She states that various chemicals including the chlorine in her water at home tend to make her quite weak. She also gets some sore muscles and some symptoms of urethritis with burning. She has apparently been doctor shopping over the last 3 years seeing a multitude of doctors giving each a 6 month window to cure her. She has had all kinds of allergy testing which has been positive via skin testing for practically everything. She currently is being treated for allergies to dust, mites, molds, corn, wheat, yeast, beet sugar, chocolate, milk, soybean, tomato and tea as well as fermelohide [sic], ethyl and chlorine, phenol and glycerine and Candida. Some of her old records that were forwarded include a positive EBV [Epstein-Barr Virus] titer. She is convinced that she has chronic fatigue syndrome secondary to EBV now. She also has positive anti-thyroid antibodies both antimicrobial and antithryroglobulin. She states that she has had RAST testing as well although these results have not been forwarded to this office. She apparently was treated with Synthroid for several months but finished her medication

a couple weeks ago and never got it refilled. When asked about depression she began to cry and state [sic] that many of the doctors that she has seen have told her to have something done about her head, however she does not seem to want to accept this type of approach. She states that once she feels good she is fine but when she feels sick that is when she gets depressed. She apparently has considered suicide by taking all of the pills in her house. However she has never attempted this and does not appear to be suicidal at this time.

Dr. Kratche's note on August 5, 1992 reads as follows, in relevant part:

S: Patient is a 43 yr. Old white female who presents for a physical without a pap. . . . Her only complaints are that of the chronic fatigue along with the sensation of weakness and chronic cystitis symptoms.
O: On physical exam - she is a well developed, well nourished white female in no acute distress. BP is normal. HEENT exam is clear. She has had multiple dental fillings. Neck is supple without thryomegaly. There are 2 submandibular lymphnodes which are slightly enlarged and tender. These are located one on either side - approximately 1 cm in diameter. Lungs are clear to auscultation. Cardiac exam demonstrates regular rate and rhythm without any murmurs, rubs or gallops. Back exam - there is no SS or CVA tenderness. She had full range of motion. Abdominal exam - belly is soft, flat without HSMG. Bowel sounds are present and normal throughout. She has some mild tenderness to palpation in the left lower quadrant. There is no rebound or guarding. Breast and pelvic exam are deferred. Extremities - there is full range of motion without any cyanosis, clubbing or edema. Neurologic exam - DTR's are +3/+2 bilaterally at the knee jerk and ankle jerk. Cranial nerves II-XI are grossly intact. Old records have been reviewed.

there was substantial evidence in the record to support the ALJ's determination that the claimant retained the residual functional capacity to perform work in the economy. *Id.* at *4-5. Specifically, there were "numerous medical assessments of [claimant's] physical ability to work as well as assessments of her mental ability to work." *Id.* at *4. The only evidence to the contrary was a physician's report that the claimant had stated that she was "physically too fatigued and in too much pain to work." *Id.* The Tenth Circuit refused to reweigh the evidence, and affirmed the decision to deny the claimant disability benefits. *Id.* at *4-5.

The First Circuit also recently dealt with a chronic fatigue syndrome disability claim. In *Abdus-Sabur v. Callahan*, No. 98-2242, 1999 WL 551133 (1st Cir. July 27, 1999) (unpublished), the claimant had been diagnosed with CFS and two of her physicians had "indicated that her physical capacities [were] quite limited." *Id.* at *1. However, a non-examining physician testified before the ALJ that the claimant had failed to meeting the criteria for CFS, and was capable of performing light work activity. *Id.* at *2. The ALJ relied on the non-examining physician's opinion (which the appellate court noted was probably based on an outdated definition of CFS), and did not credit the treating physicians' opinions. Thus, the First Circuit found "under the peculiar circumstances of this case" that there was insufficient evidence to support the ALJ's decision, and ordered a remand. *Id.* at *2-4.

The Ninth Circuit has also recently decided a claim for disability based on chronic fatigue syndrome. In *Reddick v. Chater*, 157 F.3d 715, 719-20 (9th Cir. 1998), the claimant was diagnosed with CFS punctuated by "severe fatigue" and "extreme lethargy." Both of her treating physicians had unequivocally stated that she was disabled due to her fatigue. *Id.* The ALJ relied on evidence of the claimant's activity level to find her subjective complaints about her limitations not credible, *id.* at 722, and relied exclusively on two non-examining (consultative) physician's reports to find that the claimant could return to her past relevant work, *id.* at 724.

*Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

Subjective complaints of "pain or other symptoms shall not alone be conclusive evidence of disability." 42 U.S.C. § 423(d)(5)(A). The standard for evaluating subjective complaints of pain was set forth by the Sixth Circuit in *Duncan v. Secretary of Health & Human Servs.*, 801 F.2d 847, 853 (6th Cir. 1986):

> First, we examine whether there is objective medical evidence of an underlying medical condition. If there is, we then examine: (1) whether objective medical evidence confirms the severity of the alleged pain arising from the condition; or (2) whether the objectively established medical condition is of such a severity that it can reasonably be expected to produce the alleged disabling pain.

The ALJ's findings as to a claimant's credibility are entitled to deference, because of the ALJ's unique opportunity to observe the claimant and judge her subjective complaints. *See, e.g., Gaffney v. Bowen*, 825 F.2d 98, 101 (6th Cir. 1987) (citing *Kirk v. Secretary of Health & Human Servs.*, 667 F.2d 524, 538 (6th Cir. 1981)).

In evaluating a claimant's alleged disability, medical opinions and diagnoses of treating physicians are entitled to great weight. *See, e.g., Cohen*, 964 F.2d at 528 (citing *King v. Heckler*, 742 F.2d 968, 973 (6th Cir. 1984)). However, the ALJ "is not bound by conclusory statements of doctors, particularly where they are unsupported by detailed objective criteria and documentation." *Id.*

Recently, there have been a number of cases in the federal courts regarding how chronic fatigue syndrome should be evaluated in relation to the Social Security disability analysis. For instance, in *Gardner-Renfro v. Apfel*, No. 00-6077, 2000 WL 1846220 (10th Cir. Dec. 18, 2000) (unpublished), the Tenth Circuit analyzed a claim of disability from the effects of chronic fatigue syndrome. That court found, however, that

Dr. Kratche's interpretation of this was that Buxton was "Basically Normal."

After a period of approximately two years since her last visit, Buxton again began seeing Dr. Kratche in October of 1994. Dr. Kratche treated her, noting some urine dips that were positive for blood, refilling her Vicodin prescription, and referring her to Dr. Frank for evaluation of her "questionable chronic fatigue syndrome."

### b. Dr. Frank

Family practitioner Dr. Scott Frank began seeing Buxton in mid 1994 on a referral from Dr. Kratche. Dr. Frank wrote a letter in July of 1995 to Buxton's employer's disability insurer, in response to their letter requesting more information regarding Buxton's conditions. In that letter, Dr. Frank confirmed a diagnosis of chronic fatigue syndrome for Buxton. Dr. Frank also ruled out a variety of mental disorders. Specifically, Dr. Frank noted a positive test result indicating a recent acute HHV6 infection, which Dr. Frank attributed to the (then-)recent exacerbation of her symptoms. Dr. Frank noted, however, that "not all of her symptoms are attributable to this acute HHV6 infection" because "her overall symptoms preceded the period of time during which [the test result] would remain positive." Dr. Frank's patient notes also indicated that Buxton exercised by walking 30 minutes per day, with "No post exercise collapse."

### c. Dr. Nelson

Allergy specialist Dr. Donald Nelson treated Buxton for allergies from September 1991 through at least early 1993. Dr. Nelson tested Buxton, and found her to be sensitive (allergic) to many different things, including chemicals such as phenol, glycerin, chlorine, ethanol, and formaldehyde. Dr. Nelson treated Buxton with various medications and antibiotics.

Dr. Nelson did not answer the question regarding work-related limitations on the form sent to him requesting information regarding Buxton's disability.

### d. Dr. Salata

Infectious disease specialist Dr. Robert Salata saw Buxton twice on a referral from Dr. Kratche in early 1993. Dr. Kratche referred Buxton to Dr. Salata for evaluation of her possible CFS. Dr. Salata wrote Dr. Kratche a letter in March of 1993 regarding his evaluation of Buxton. Dr. Salata conducted tests, and concluded that the results were "consistent with prior infection." Dr. Salata opined that "there was no evidence currently of an ongoing infectious disease that was related to her symptom complex."

In response to a request for more information about Buxton's disability status, Dr. Salata opined that Buxton was "not limited" in her physical work-related activities, but "somewhat limited" in mental work-related activities.

### e. Dr. Bielefeld

Psychologist Dr. Marie Bielefeld saw Buxton for a period of years (it is not clear from the record) from at least 1993 through the end of 1994. In response to an inquiry regarding the nature of Buxton's mental impairment/disability, Dr. Bielefeld noted that Buxton's "[m]ood is somewhat depressed. . . . There is somatic preoccupation which is not surprising given the nature of her physical disorders." Dr. Bielefeld further noted that Buxton's intellectual functioning was "Normal, except during severe allergic reactions." Dr. Bielefeld noted Buxton's social isolation due to her allergic reactions to chemicals.[4] Dr. Bielefeld opined that "At the present time, however, it is my impression that she could not

---

[4]Dr. Bielefeld's answers indicate a belief that most, if not all, of Buxton's mental/emotional impairments are directly attributable to the physical maladies Buxton has reported to her – primarily, her alleged severe chemical sensitivities to even minute amounts of certain chemicals.

age, education, and past work experience to see if you can do other work. If you cannot, we will find you disabled.

20 C.F.R. § 404.1520(b)-(f). If the Commissioner seeks testimony from a Vocational Expert ("VE") in order to make findings as to a claimant's residual functional capacity, the hypothetical question(s) posed to the VE must accurately represent the claimant. *See, e.g., Hardaway v. Secretary of Health & Human Servs.*, 823 F.2d 922, 927 (6th Cir. 1987). A dispositive finding at any step in the five-step process ends the inquiry. 20 C.F.R. § 404.1520(a).

Congress has provided for federal court review of Social Security administrative decisions. 42 U.S.C. § 405(g). However, the scope of review is limited under 42 U.S.C. § 405(g): "The findings of the Secretary as to any fact, if supported by substantial evidence, shall be conclusive . . . ." In other words, on review of the Commissioner's decision that claimant is not totally disabled within the meaning of the Social Security Act, the only issue reviewable by this court is whether the decision is supported by substantial evidence. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986). Substantial evidence is " 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' " *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).

The findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion. *Mullen*, 800 F.2d at 545; *see also Her v. Commissioner of Social Security*, 203 F.3d 388, 389-90 (6th Cir. 1999) ("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached. *See Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)."). This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference.

perform several jobs within the economy despite her limitations.

In order to qualify for disability benefits, a claimant must establish that she is disabled within the meaning of the Social Security Act. 42 U.S.C. § 423(a)(1)(D). Disability claims are evaluated according to a five-step sequential process. 20 C.F.R. § 404.1520. The five steps are as follows:

(b) If you are working. If you are working and the work you are doing is substantial gainful activity, we will find that you are not disabled regardless of your medical condition or your age, education, and work experience.
(c) You must have a severe impairment. If you do not have any impairment or combination of impairments which significantly limits your physical or mental ability to do basic work activities, we will find that you do not have a severe impairment and are, therefore, not disabled. We will not consider your age, education, and work experience. However, it is possible for you to have a period of disability for a time in the past even though you do not now have a severe impairment.
(d) When your impairment(s) meets or equals a listed impairment in appendix 1. If you have an impairment(s) which meets the duration requirement and is listed in appendix 1 or is equal to a listed impairment(s), we will find you disabled without considering your age, education, and work experience.
(e) Your impairments(s) must prevent you from doing past relevant work. If we cannot make a decision based on your current work activity or on medical facts alone, and you have a severe impairment(s), we then review your residual functional capacity and the physical and mental demands of the work you have done in the past. If you can still do this kind of work, we will find that you are not disabled.
(f) Your impairment(s) must prevent you from doing any other work. (1) If you cannot do any work you have done in the past because you have a severe impairment(s), we will consider your residual functional capacity and your

be placed in a job and maintain it for health reasons stated above."

In a letter written to Buxton's employer's disability insurer in 1995, apparently in response to a request for information, Dr. Bielefeld set forth some symptoms that Buxton had apparently relayed to her, and then opined:

Ms. Buxton has become depressed over the last few months. She is very discouraged about her medical condition. . . . Ms. Buxton is not well enough to work at this point. She does not have sufficient stamina and mental alertness to accomplish even a half day of work. . . . [CFS] and [CSS] are the obstacles to Ms. Buxton being able to perform gainful employment. Except for these medical problems, Ms. Buxton never demonstrated any problems on the job at Stouffer's that would inhibit her from future employment.

#### *f.  Dr. Deorio*

General practitioner Dr. Kevin Deorio treated Buxton from March until September of 1993. Dr. Deorio noted that due to her chemical sensitivity, Buxton had "work limitations" which included an "inability to function in all activities secondary to acute chlorine exposure." Dr. Deorio further noted that due to her chronic fatigue, Buxton was "unable to perform [at] a functional level of output." In treating Buxton for her ailments (CFS and chronic urethritis), Dr. Deorio indicated Buxton's response was "fair" when she followed his treatment suggestions of changing her diet, resting, and taking nutritional supplements.

### g. Dr. Gordon

In a letter dated April 12, 1994,[5] urology specialist Dr. Julian Gordon indicated Buxton had been seen twice in 1994 for urethral burning, but that "[a]ll testing done through [Dr. Gordon's] office was negative including urethral and urine cultures, as well as an x-ray showing no evidence of urethral abnormalities." Dr. Gordon opined that Buxton's "urethral burning in no way creates a disability from a physical perspective."

### h. SSA Medical Expert Witness, Dr. Cox

Internist Dr. Frank Cox testified before the ALJ at the second hearing in September of 1998. The ALJ asked Dr. Cox to identify and evaluate Buxton's mental disorders, based on Dr. Cox's review of Buxton's medical records. Dr. Cox then explained the diagnosis of CFS and discussed the history of the medical field's development of a definition for the disease. Dr. Cox then explained that Buxton had a positive result for a human herpes virus titer, that may or may not have related to the CFS. Dr. Cox then explained that Buxton's diagnosis of multiple chemical sensitivities was not a diagnosis recognized by "conventional medical centers." Dr. Cox explained that the alleged symptoms of CSS were "almost identical" to those associated with CFS. Dr. Cox then explained that Buxton had a diagnosis for her irritable urethra, but that the urologist had indicated it would not cause a disability.

The ALJ then inquired about Buxton's alleged allergies. Dr. Cox acknowledged Buxton had been evaluated, and tested positive for, some allergies, but stated "there's just nothing in

---

[5]The typed date on the letter is obviously incorrect, and should probably be April 12, 1995. A date stamp also appears on the letter, possibly indicating that the Bureau of Hearings and Appeals received the letter on April 17, 1995, which would explain the internal inconsistency with the letter date saying April 1994 but the body stating that Buxton had not been seen by Dr. Gordon since November 1994.

---

syndrome, chemical sensitivity syndrome, depression, and somatoform disorder," she is not "disabled" as defined by the Social Security Act. The ALJ accepted the VE testimony that there were jobs in significant numbers in national economy which Buxton had the capacity to perform.

## II. ANALYSIS

Buxton's arguments are these: that the combination of her actual physical conditions, and her mental perception of her limitations/physical conditions, renders her totally unable to engage in work; that the ALJ (Commissioner) and the district court failed to consider the effect her mental perception of her limitations has on Buxton's ability to work; and that even if her mental perceptions regarding her physical ailments/limitations are mistaken, the ALJ/Commissioner/district court should have considered the sincerity of her mistaken beliefs in determining whether she is able to engage in work. Buxton notes that in arriving at the decision, the ALJ "relied upon" a statement made some five years prior to the second hearing, in which Buxton had stated that she was physically capable of taking care of her person needs, her living area, and was performing many activities of daily life. Buxton argues that the ALJ's reliance upon that statement was erroneous because she is not asserting a physical or exertional limitation, only non-exertional impairments.[6] Buxton argues that the ALJ should have been focusing on the delusional aspects of her condition(s), rather than the medical conditions themselves.

The Commissioner argues simply that there is sufficient evidence in the record to support the ALJ's determination that Buxton: suffered from four serious impairments (CFS, CSS, depression, somatoform disorder); could not return to her past work; nonetheless, had the residual functional capacity to

---

[6]This statement/argument is what differentiates Buxton's claim here from most, if not all, CFS cases. As discussed *infra*, in other CFS cases, the main argument focused on the ALJ/Commissioner's alleged failure to fully account for the exertional limitations resulting from CFS.

nonexertional impairments, and that is that this worker must work in an environment . . . limited to routine, simple, repetitive tasks that do not carry any high production requirements; that is, the worker can do work at an ordinary pace and in an ordinary work routine. This worker cannot work at any jobs or occupations that would require confrontation, negotiation, persuading, not to be responsible for the safety of others, and would only require nonintense or neutral interactions with the public, with her supervisors or fellow workers.

First, the ALJ asked the VE whether Buxton could return to her past relevant work, and the VE opined that Buxton could not. The ALJ then asked the VE whether a hypothetical person with Buxton's profile could perform other jobs or occupations in the economy. The VE opined that such a person could perform as a file clerk, meat clerk, garment sorter, and food service worker, and that each of these jobs exists in both the Ohio and the national economies in significant numbers.

Buxton's attorney then inquired of the VE, whether any of the jobs she listed did not require full-time concentration or attention. The VE stated that all of them would require full attention. The ALJ then asked the VE whether there were jobs with varying degrees of concentration, to which the VE answered yes, and stated that jobs requiring intense concentration usually have high quotas or high stress. The hearing ended at that point.

### 4.  ALJ's Findings

An initial hearing was held in February, 1996 before an ALJ, who found Buxton not disabled. Following a remand to correct an inconsistency in the opinion, the ALJ held a second hearing in September, 1998. Buxton testified at the first hearing, but waived her right to appear at the second hearing. Based on the extensive medical record, Buxton's testimony, testimony by the two consultative physicians, and Vocational Expert ("VE") testimony, the ALJ concluded that although Buxton has "severe impairments consisting of chronic fatigue

her evaluation that would be accountable for her disability." The ALJ discussed with Dr. Cox that the ALJ had previously made a finding about Buxton's need to avoid exposure to a work environment with multiple chemicals, and asked Dr. Cox's opinion with regard to that finding. Dr. Cox opined: "if you're asking me, is there a medical reasonable certainty that working next to or in that plant would harm her, I would have to [s]ay no."

Dr. Cox was then questioned by Buxton's attorney. Dr. Cox indicated that he had treated patients with CFS, and that CFS was a recognizable diagnosis. Dr. Cox further indicated that to some extent, a patient's symptoms are the primary factor used to diagnose CFS. Dr. Cox also stated that he did not quarrel with Buxton's diagnosis of CFS. Dr. Cox opined that multiple chemical sensitivities as a diagnosis was quackery, and that those associated with its treatment had not shown "that these programs do a bit of good other than costing a lot of money."

Following questioning by Dr. Daniel Schweid (*infra*), the ALJ readdressed Dr. Cox for a brief moment. The ALJ asked Dr. Cox if he had reconsidered any of his testimony, and Dr. Cox said "no" but further explained "I mean, they use bleach somewhere in the house, and her urethra immediately began to burn and she, she had to sleep . . . on a cot by the door for three days. I mean, that's not a physical illness. And it's not an allergy. There's no way, but – . . . she's been allowed to think that."

### i.  SSA Medical Expert Witness, Dr. Schweid

Psychiatrist Dr. Daniel Schweid testified before the ALJ at the second hearing in September of 1998. Based on Dr. Schweid's review of Buxton's medical records, the ALJ asked Dr. Schweid to identify and evaluate Buxton's psychological or psychiatric disorders that might affect Buxton's occupational abilities. Dr. Schweid first opined that his review of the records showed that none of Buxton's physicians had adequately evaluated the psychiatric

component to Buxton's diagnoses of CFS and CSS, not even Dr. Bielefeld, the psychologist.

Dr. Schweid then discussed, at length, the medical community's debate regarding whether chronic fatigue immune dysfunction/CFS and multiple chemical sensitivities/CSS are legitimate diagnoses, and if so, what research criteria a physician should use to make the diagnosis. Dr. Schweid indicated that there was a subset of physicians who were "true believer[s]" who would try to treat these patients with treatments that either did not work, or would have the effect of reinforcing the patient's beliefs that she could not tolerate exposure to certain chemicals--"it becomes iatrogenic, an iatrogenic illness, after a while."

Dr. Schweid then discussed Buxton's doctors. He noted that a couple of her physicians had advocated the CFS/CSS diagnoses, but that Dr. Salata, the infectious disease specialist, had noted that she did not quite meet the criteria for the diagnosis, although he did not affirmatively discount the diagnosis. Dr. Schweid also noted Dr. Frank's herpes virus theory as possibly being a causal element to her symptoms.

However, Dr. Schweid opined that what Buxton truly suffered from was depression, somatoform disorder, or both. He noted that patients such as Buxton do not want to believe that they have a psychiatric disorder, so sometimes no physicians will even entertain the idea of a psychiatric disorder. Dr. Schweid then "translate[d]" the parts of the record that do not seem to support CFS, but do support somatoform disorder, which he noted is found at 12.07 in the listings. Dr. Schweid further opined that Buxton is depressed, and evaluated her depression under the listing 12.04.

Dr. Schweid noted that the elements of a 12.07 somatoform disorder are present in Buxton's case: "hypochondriasis, . . . some unrealistic interpretation of physician signs or sensations associated with the preoccupation or belief that she has a serious disease or injury, . . . chronic fatigue, and maybe some chronic pain." Dr. Schweid then noted the elements of

a 12.04 depressive disorder that are present in Buxton's case: "loss of interest, that is anhedonia, . . . sleep disturbance, . . . decreased energy, . . . difficulty concentrating." As to her level of impairment, Dr. Schweid opined she is "moderately impaired" in her activities of daily living and social functioning; "often impaired" in "[c]oncentration, persistence, and pace," etc. Dr. Schweid opined that Buxton does not meet the listing of the impairment. However, he did suggest some limitations Buxton might have by reason of her somatoform or depressive syndromes: "her situation would have to be routine, low stress, no high production quotas, and because of irritability, no situations that are intrinsically confrontational or . . . very intense interpersonal transactions. . . . She should not be in a situation where she would be responsible for the safety or welfare of others, and I think that would define it."

Upon questioning by Buxton's attorney, Dr. Schweid opined that Buxton was "not primarily a malingerer. . . . She's both hypochondriacal and responsive to her doctors who say that [she should not touch certain things or be in a room where certain chemicals exist, etc.]. . . . [S]he likes to listen to the ones that verify it." Dr. Schweid clarified that when he was assessing the impairments (see paragraph above), he was assessing for both listings 12.07 and 12.04. Dr. Schweid opined that Buxton is "at least moderately impaired in all of this, but I don't think extremely impaired, and I don't think markedly impaired." Dr. Schweid concluded: "I don't think this issue we're dealing with stands or falls on the diagnosis. It's more on, on the operational issues, the functional issues."

### 3. *Vocational Expert Testimony*

At the second hearing in September of 1998, vocational expert Carol Mosley ("VE") was asked some questions regarding jobs available in the economy based on Buxton's profile. The ALJ described the hypothetical profile:

no exertional impairments, . . . high school graduate . . . not yet 50 years of age, . . . some significant