**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
**File Name: 05a0866n.06**
**Filed: October 24, 2005**

**No. 04-5709**

**UNITED STATES COURT OF APPEALS**
**FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| ARTHUR R. DANIELS, JR., | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | ON APPEAL FROM THE UNITED |
| v. | ) | STATES DISTRICT COURT FOR THE |
| | ) | EASTERN DISTRICT OF KENTUCKY |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY, | ) | |
| | ) | |
| Defendant-Appellee. | ) | |

**Before: BOGGS, Chief Judge; GIBBONS, Circuit Judge; QUIST, District Judge.***

**JULIA SMITH GIBBONS, Circuit Judge.** Arthur R. Daniels filed an application for

disability insurance benefits and Supplemental Security Income benefits in July 2001. The

application was denied initially and on reconsideration. On October 21, 2002, a hearing was held

before an administrative law judge (ALJ). The ALJ denied Daniels's claim. The Appeals Council

denied his request for review. Daniels then sought judicial review of his application in the United

States District Court for the Eastern District of Kentucky. The district court affirmed the

Commissioner's decision that Daniels was not disabled. Daniels filed a timely notice of appeal. For

the following reasons, we conclude that the ALJ's decision was supported by substantial evidence

and affirm the district court's decision.

---

*The Honorable Gordon J. Quist, United States District Judge for the Western District of
Michigan, sitting by designation.

*Daniels v. Commissioner of Social Security*, 04-5709

I.

Daniels filed an application for disability insurance benefits and Supplemental Security Income benefits in July 2001, alleging that he has been unable to work since June 30, 2000. Daniels complained of back pain, sciatica, nerve damage, and chronic prostatitis. At the time of his application, he was thirty-five years old and had worked as a kitchen manager, custodian, car wash supervisor, auto shop worker, and laborer at a lumber company. He has the equivalent of a high school education.

The record indicates that Daniels first sought medical treatment for his back pain in the emergency room in July 1999. The physician diagnosed him with acute mechanical low back pain with bilateral sciatica. Daniels was prescribed Vicodin and ibuprofen and advised to follow up with another physician. In his application, Daniels stated that he visited the emergency room on five subsequent occasions in 2000 and 2001 for severe pain in his back and left leg. Actual reports for these hospital visits are not included in the record.

Daniels sought treatment at the King's Daughters' Outreach Center beginning in July 2001. In July 2001, Daniels complained of back, hip, and leg pain. He stated that the level of pain on a scale of one to ten ranged from three at best to ten at worst. The physician diagnosed him with sciatica and prostatitis and gave him samples of Vioxx to take. At a later appointment in July 2001, Daniels reported that the Vioxx was helping his back pain and that the worst his pain got on a scale of one to ten was now a seven. He was diagnosed with musculoskeletal back pain, sciatica, and prostatitis, given a prescription for Vioxx, and referred to physical therapy.

In August 2001, Daniels reported that the physical therapy had reduced his back and hip

pain. His prostatitis had also improved. However, he was still experiencing numbness in his thigh. The examiner indicated that Daniels possibly was suffering from osteoarthritis and recommended a consultation with a rheumatologist for blood work.

The next month, Dr. Rita Ratliff performed a consultative examination on Daniels. Daniels told Dr. Ratliff that his back pain was "only an intermittent problem" but that the hip pain was constantly present. He also complained of a "burning sensation in the left lower extremity" that radiated downward. A physical examination revealed decreased range of motion in the left hip, while an x-ray showed an ossific density next to the left hip joint space, but "no evidence of significant degenerative joint disease." Dr. Ratliff's overall impression was that Daniels had some symptoms suggestive of possible radiculopathy, but that "this was not evident on examination and his hands were extremely callused, suggesting he had been doing significant labor." Additionally, Dr. Ratliff commented that "[n]o physical evidence for significant restriction in patient's tolerance for stopping, bending, reaching, sitting, standing, moving about, lifting, carrying, handling objects or ability to travel was observed."

Daniels returned to King's Daughters' Outreach Center in November 2001. He reported that his pain was a ten and that nothing was relieving the pain. Daniels had an MRI, which showed degenerative disc disease, a bulging disc, and a herniated disc. Dr. Cynthia Pinson recommended that Daniels see a neurosurgeon (although Daniels could not pay for the neurosurgeon's care due to a lack of money and ineligibility for Medicaid).

In November 2001, state agency physician Dr. Timothy Gregg reviewed Daniels's medical record, completed a physical residual functional capacity assessment, and submitted a written

statement. Dr. Gregg concluded that Daniels could occasionally lift or carry twenty pounds, frequently lift or carry ten pounds, stand or walk for about six hours in a workday, sit for about six hours in a workday, and had limited ability to push or pull using the lower extremities. He also found that Daniels could occasionally climb ramps or stairs, stoop, kneel, crouch, or crawl. However, Daniels could never climb ladders, ropes, or scaffolds. Dr. Gregg further placed no manipulative, visual, communicative, or environmental limitations on Daniels, except for indicating that Daniels should avoid even moderate exposure to vibration.

At Daniels's hearing before the ALJ in October 2002, Daniels and vocational expert (VE) Anthony Michael testified. The ALJ asked the VE to assume a thirty-six year old individual with a high school education and Daniels's past work history. The ALJ limited the individual "to working at the light level of exertion" and to occasional stooping, kneeling, crouching, crawling, or climbing of ramps or stairs. Additionally, the ALJ included in the hypothetical that the individual could not climb ropes, ladders, or scaffolds and should avoid even moderate exposure to vibration.

Based on the hypothetical, the VE concluded that Daniels could perform his past work as a kitchen manager. He also testified that Daniels could be a cashier, mail clerk, order clerk, and dispatcher. The ALJ asked if an hourly sit/stand option would affect these jobs. The VE responded that the individual needing a sit/stand option could still perform these jobs, but that there would be fewer jobs available in the cashier or mail clerk category.

The ALJ issued a decision denying Daniels's application for benefits. The ALJ reviewed the evidence pursuant to the five-step sequential analysis set forth in 20 C.F.R. §§ 404.1520 and

*Daniels v. Commissioner of Social Security*, 04-5709

416.920. The ALJ determined that Daniels's degenerative disc problems and radiculopathy were severe. However, Daniels's impairments did not meet or equal any of the listings. The ALJ concluded that Daniels's credibility regarding his subjective complaints and functional limitations to be "only fair at best." Based on this assessment, Daniels's medical records, and the VE's testimony, the ALJ found that Daniels could perform his past relevant work along with other jobs and therefore was not disabled.

The Appeals Council denied Daniels's request for review. Daniels then sought judicial review. The district court affirmed the Commissioner's decision that Daniels was not disabled.

II.

When reviewing the Commissioner's decision as to whether an individual is disabled, this court is limited to assessing whether there is substantial evidence in the record supporting the ALJ's determination and whether the ALJ followed the proper legal standards. *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997). Substantial evidence means "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 285, 286 (6th Cir. 1994). In determining whether substantial evidence exists, this court must review the administrative record as a whole. *Id.* The Commissioner's findings are not subject to reversal "merely because there exists in the record substantial evidence to support a different conclusion." *Buxton v. Halter*, 246 F.3d 762, 772 (6th Cir. 2001). The court may not review the case *de novo*, resolve conflicts in evidence, or decide questions of credibility. *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

III.

On appeal, Daniels argues that the ALJ overlooked or ignored the following pieces of evidence in formulating her credibility finding: (1) the medical evidence of Dr. Pinson, whom he claims is his treating physician; and (2) six emergency room visits.

Claimants challenging the ALJ's credibility findings face an uphill battle. As this court has held, "[u]pon review, we are to accord the ALJ's determinations of credibility great weight and deference particularly since the ALJ has the opportunity, which we do not, of observing a witness's demeanor while testifying." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 476 (6th Cir. 2003). The court is limited to assessing whether the "ALJ's explanations for . . . discrediting [the claimant] are reasonable and supported by substantial evidence in the record." *Id.*

Daniels argues that the ALJ did not take into account six visits he had to the emergency room in 2000 and 2001. However, the only evidence in the record that Daniels went to the emergency room on five of those occasions was listed in a disability report filled out by Daniels himself. In that report, Daniels checked a box stating that he had been to the emergency room and listed the dates of his visits as June 15, 2000, August 15, 2000, October 15, 2000, February 15, 2001, and June 15, 2001. He also indicated that he had sought treatment for pain in his back and left leg on those occasions. Notably absent from the record is any documentation or reports from physicians or the hospital about these visits. Thus, there was no medical evidence in the record for the ALJ to consider what arose out of these emergency room visits. Further, "[a]lthough required to develop the record fully and fairly, an ALJ is not required to discuss all the evidence submitted, and an ALJ's failure to cite specific evidence does not indicate that it was not considered." *See Simons v. Barnhart*, 114 Fed. Appx. 727, 733 (6th Cir. 2004) (quoting *Craig v. Apfel*, 212 F.3d 433, 436 (8th

Cir. 2000)). Although the ALJ may not have specifically referenced the emergency room visits, that does not mean that the ALJ did not review the information submitted in the disability report.

Daniels also takes issue with the ALJ's statement, "While I note that he reports that he has been unable to continue treatment and receive prescription medications due to lack of funds, there is no indication in the record that his pain symptoms have exacerbated to the point that he had no other option but to seek emergency treatment, with the exception of one reference to emergency treatment in November 2001." However, this statement does not evidence that the ALJ disregarded evidence of the aforementioned emergency room visits; rather, the statement more likely refers to the fact that Daniels stopped receiving treatment for his back after November 2001 for monetary reasons and has not gone to the emergency room since that time. Thus, the ALJ's statement was not erroneous.

Daniels next argues that Dr. Pinson's opinion was not afforded deference by the ALJ.[1] Daniels's argument with respect to this issue stems from a deposition that Daniels's attorney took of Dr. Pinson in October 2002. In that deposition, Dr. Pinson testified that she treated Daniels on two occasions during the month of November 2001. Daniels's attorney then asked Dr. Pinson a series of questions. The questions centered around Daniels's subjective complaints, including difficulty standing for long periods of time, difficulty sitting without aggravating the pain, the need

---

[1]The ALJ did discuss the medical evidence presented in Dr. Pinson's notes, including the facts that he had an MRI that showed a herniated disc and disc degeneration and also suffered from chronic back pain with lumbar radiculopathy. The ALJ credited this evidence. The ALJ also observed that Dr. Pinson did not provide a "physical capacity" assessment documenting any limitations that these conditions would place on Daniels. The record thus reflects that the ALJ considered Dr. Pinson's notes in determining Daniels's impairments.

to use a cane because of difficulty walking, the need to use a heating pad, BenGay, and other tools to relieve pain, and a burning sensation. Daniels's attorney asked if these subjective complaints were consistent with his condition, and Dr. Pinson responded affirmatively. He concluded the deposition by asking, "Dr. Pinson, as far as his future is concerned, how do you feel about his care?" Dr. Pinson answered, "I feel at that time the person was not adequately treated, but if he had insurance or some kind of medical coverage, he could have had surgery, which may not have resulted in total disability."

The ALJ's opinion referred, in passing, to Dr. Pinson as a treating source or treating physician, thus adopting Daniels's own characterization of Dr. Pinson. The ALJ subsequently did not specifically address Dr. Pinson's deposition testimony in reaching a determination that Daniels was not disabled.

Under the treating source regulations, the Commissioner of Social Security generally gives "more weight to opinions from [the claimant's] treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [the claimant's] medical impairment(s)." 20 C.F.R. § 404.1527(d)(2). The Commissioner will give the opinion of a treating physician controlling weight, if the opinion is well-supported and not inconsistent with the other substantial evidence. *Id.* When the opinion of the treating physician is not given controlling weight, factors such as the length of the treatment relationship, nature and extent of the treatment relationship, and the supportability of the physician's opinion will be considered in determining how much weight to afford the opinion. *Id.* The regulations also require the ALJ to give "good reasons in our notice of determination or decision for the weight . . . give[n] your treating

*Daniels v. Commissioner of Social Security*, 04-5709

source's opinion." 20 C.F.R. § 404.1527(d)(2); *see also* Social Security Ruling 96-5p (requiring the ALJ to provide an explanation of "the consideration given to the treating source's opinion(s)" on issues reserved to the Commissioner). "'The requirement of reason-giving exists, in part, to let claimants understand the disposition of their cases,' particularly in situations where a claimant knows that his physician has deemed him disabled and therefore 'might be especially bewildered when told by'" an ALJ that the claimant is not disabled. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004) (quoting *Snell v. Apfel*, 177 F.3d 128, 134 (2d Cir. 1999)).

In *Wilson*, this court held that reversal is required when the agency fails to follow the treating source regulations and does not "give good reasons" for not giving weight to a treating physician's opinion in the context of a disability determination. *Id.* It reasoned that the treating source regulations impose a clear procedural requirement that the ALJ is bound to follow. *Id. Wilson* left open the possibility that "a violation of the procedural requirement[s] . . . could . . . constitute harmless error" and did "not decide the question of whether a *de minimis* violation [could] qualify as harmless error." *Id.* at 547.

We conclude that the treating source regulations and *Wilson* are not implicated by the facts of this case.[2] The ALJ's failure to specifically address Dr. Pinson's opinion, despite casually referring to her as the treating source, is not surprising given that Dr. Pinson does not meet the criteria under the regulations to be defined as a treating physician. The regulations define a treating physician as a physician who has provided medical treatment or evaluation and "who has, or has

---

[2]We also observe that Daniels did not challenge any procedural deficiencies on the part of the ALJ before this court.

- 9 -

had, an ongoing treatment relationship with" the claimant. 20 C.F.R. § 404.1502. The Commissioner will consider a claimant to have an ongoing treatment relationship when "the medical evidence establishes that [the claimant] see[s], or ha[s] seen, the source with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for [the claimant's] medical condition(s)." *Id.* A physician who has treated a patient only a few times may be considered a treating source if that frequency of visits is appropriate for the claimant's medical condition. *Id.* In this case, Dr. Pinson saw Daniels on two occasions, November 13, 2001, and November 16, 2001. Daniels, however, sought treatment for his back pain on many more occasions than these two visits, including six visits to the emergency room and several other visits to King's Daughters' Outreach Center. Daniels's two visits to Dr. Pinson within the span of a few days is not a frequency consistent with the treatment of back pain, as evidenced by the fact that he received treatment from other sources on many other occasions. *Cf. Wilson*, 378 F.3d at 545 (describing physician as the treating physician of an applicant for disability benefits based on back and leg pain when the physician had seen the applicant from January 1993 through May 2000).

Even if Dr. Pinson could be considered Daniels's treating physician, the ALJ's failure to address specifically her deposition testimony constitutes a *de minimis* violation of the regulations and thus is harmless error under *Wilson*. Dr. Pinson's statement during the deposition was confusing. She stated that "if he had insurance or some kind of medical coverage, he could have had surgery which may not have resulted in total disability." It is unclear what exactly she meant by this statement and therefore unclear exactly what the ALJ could have gleaned from this statement. Moreover, the ALJ notes that Dr. Pinson "did not provide a physical capacity of the assessment

based upon the claimant's condition." Further, the deposition in part consisted of Daniels's attorney asking Pinson if Daniels's complaints were consistent with the back pain for which she treated him. Thus, her statements essentially go to Daniels's credibility, an area in which the ALJ has particular competence and an opportunity to observe the claimant. For these reasons, Dr. Pinson's testimony was not an opinion to which the ALJ was required to give any particular weight, and the failure to specifically address her deposition testimony in the written opinion was harmless error.

Finally, Daniels contests the ALJ's credibility finding. The ALJ found "the credibility of the claimant's subjective complaints (and allegedly related functional limitations) to be only fair at best." She continued, "I decline to accept that [his] impairments result in the degree of limitation alleged by the claimant." This determination was supported by substantial evidence. None of the treatment notes from his visits to the emergency room or King's Daughters' Outreach Center indicated that limitations were placed on Daniels with respect to work or physical activity. Further, in July and August 2001, Daniels reported that the Vioxx was helping his back pain and the physical therapy had reduced his back and hip pain. He also reported that he had been moving furniture on a visit to King's Daughters' Outreach Center during this time. In September 2001, Daniels told Dr. Ratliff that his back pain was "only an intermittent problem," although his hip pain was constantly present. In November 2001, Dr. Gregg reviewed his medical records and concluded that Daniels could still occasionally lift or carry twenty pounds, frequently lift or carry ten pounds, stand or walk for about six hours in a workday, sit for about six hours in a workday, and had limited ability to push or pull using the lower extremities. He also found that Daniels could occasionally climb ramps or stairs, stoop, kneel, crouch, or crawl. This evidence, coupled with the ALJ's opportunity to observe

*Daniels v. Commissioner of Social Security*, 04-5709

Daniels during the hearing, more than adequately supports the ALJ's determination that Daniels was not as incapacitated as he alleged and thus that Daniels was not completely credible.

IV.

For the foregoing reasons, we conclude that the ALJ's decision was supported by substantial evidence and affirm the district court's decision.