**Candice Chisholm LOCKE, Plaintiff,**

**v.**

**Larry G. MASSANARI,[1] Acting Commissioner of the Social Security Administration, Defendant.**

**No. CIV.A. H–00–0238.**

United States District Court, S.D. Texas, Houston Division.

July 20, 2001.

---

1. Larry G. Massanari became the Acting Commissioner of Social Security on March 29, 2001. Pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure, Larry G. Massanari should be substituted, therefore, for Commissioner William A. Halter, as the defendant in this suit. No further action need be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

Victor N Makris, Bellaire, TX, Dwayne Earl Bilton, Gulf Coast Legal Foundation, Houston, TX, for Candice Chisholm Locke, plaintiff.

Candice Chisholm Locke, Spring, TX, pro se.

Eleanor A Robinson–Gaither, Assistant U.S. Atty, Houston, TX, for Social Security Administration, defendant.

## MEMORANDUM AND ORDER

BOTLEY, United States Magistrate Judge.

This action is brought by Candice Chisholm Locke ("Locke"), pursuant to 42 U.S.C. § 405(g) and § 1383(c)(3), seeking judicial review of the Commissioner of the Social Security Administration's ("Commissioner") final decision denying her claim for disability insurance benefits and supplemental security income under Titles II and XVI of the Social Security Act ("the Act"), 42 U.S.C. §§ 416(i) and 423, 42 U.S.C. § 1382c(a)(3). See *Plaintiff's Motion for Summary Judgment* (Docket Entry # 20). The Commissioner urges that the decision denying Locke's claim for benefits be upheld, as he maintains the claimant is not disabled. See *Defendant's Motion for Summary Judgment* (Docket Entry # 14). However, Locke contends that the Court should grant summary judgment in her favor, or in the alternative, that the administrative law judge's ("ALJ") decision should be remanded for further administrative proceedings, maintaining that it is not supported by substantial evidence and that the proper legal standards were not applied, because the ALJ gave improper weight to the medical evidence, and improperly assessed her residual functional capacity. Furthermore, Locke contends the ALJ improperly failed to find that the plaintiff had a "severe" mental impairment. The Commissioner, however, maintains that the ALJ's decision was proper because the ALJ correctly evaluated the medical evidence, the plaintiff lacked credibility, and the plaintiff did not have a disabling mental disorder. The Commissioner argues that the determination that Locke is not disabled, but is capable of working, is supported by substantial evidence and represents a correct application of legal standards. The Commissioner, therefore, disputes Locke's

claims and urges that the ALJ's denial of benefits must be affirmed.[2]

## I. STATEMENT OF FACTS

### A. *Factual Background—The Medical History and Alleged Impairments*

Candice Chisholm Locke, born January 21, 1964, was thirty-three (33) years old at the time of her second hearing before an ALJ in December 1997. A divorced mother of one son, Locke resides in an apartment with her live-in boyfriend. She completed high school and one year of college education. Locke has not engaged in substantial gainful activity since July 15, 1995. Locke's work history includes employment as a receptionist, typist, file clerk, and as an operator for the Houston Post. Her last documented period of gainful employment lasted for two months at the end of 1995. She seeks disability insurance and supplemental social security income benefits for alleged impairments arising from chronic fatigue syndrome ("CFS") and the Epstein–Barr virus.

On May 28, 1991, Candice Locke was examined by Dr. Joseph Aziz due to swollen, infected lymph nodes in the left groin area, which he treated with medication in order to avoid surgery. Locke was seen again by Dr. Aziz on June 18, 1991 (R. 195).

On December 10, 1992, Locke was examined by Dr. Patricia Salvato for an opinion regarding her ovarian cysts. She had previously complained of abdominal discomfort, dizziness, and tiredness, and stated she was "sleeping a lot." Locke reported increasing abdominal and pelvic pain, as well as a short menstrual period. A physical examination by Dr. Salvato revealed that Locke had a temperature of 98.8 degrees and blood pressure level of 112/72.

Dr. Salvato found the HEENT clear, neck supple, chest and lungs clear, the abdomen soft, bowel sounds present, and no organomegaly. Dr. Salvato noted that a pap smear, administered on November 24, 1992, was negative. A blood test showed a slightly elevated white blood count, and an eosinophil count of 27%, where the normal range was 0–6%. A urinalysis showed trace amounts of occult blood. Dr. Salvato scheduled an ultrasound of the pelvis for December 17, 1992. (R. 116, 157–58)

The medical record next shows that on February 1, 1993, Locke reported worsening depression and anxiety, and continued abdominal pain. The ultrasound revealed functional cysts in her ovaries. Dr. Salvato noted that Locke had a history of PMS, and prescribed paxil 20mg qd. On March 1, 1993, after Locke reported no change in tiredness and irritability, and worsening cramps, Dr. Salvato referred her to an obstetrician/gynecologist. She also prescribed zoloft 50g. On April 8, 1993, she prescribed zantac 150mg and demulen 1/35–28. On May 10, 1993, Locke reported at a checkup that stomach pain, bowel movements, and irritability had improved, nausea was gone, while PMS did not change. On June 2, 1993, Locke reported she had stopped taking zoloft, because "it did not agree with her stomach." She reported taking busbar 5mg three times daily. On August 10, 1993, in response to upper right abdominal pain, Dr. Salvato ordered an ultrasound (R. 118–123).

On November 18, 1993, Locke reported feeling more tired, weak, dizzy, nauseated than usual, and first reported having night sweats. She reported having flu-like symptoms off and on, feeling great some days but "then other days I can't hardly

---

**2.** References made to statements taken from that portion of the record identified as the transcript of the administrative hearing are designated "T," followed by the applicable page number(s) of the record; and references made to items contained in the remainder of the record are designated "R," followed by the applicable page number(s).

leave the house from tiredness." Dr. Salvato ordered an Epstein–Barr profile, which was completed by the laboratory on November 11, 1993. The test indicated a past Epstein–Barr virus infection. Dr. Salvato stated in a subsequent letter that she made a diagnosis of chronic fatigue syndrome at that time. On November 16, 1993, Locke was prescribed interferon 5cc BID (10 cc daily). On December 7, 1993, Locke appeared having a cough with yellow-green sputum for two weeks, as well as night sweats, and reported sleeping a lot because she was always tired. In the examination, Dr. Salvato noted her lungs appeared clear on auscultation, her throat was clear, she had a temperature of 99.1 degrees, and her nodes exhibited slight submaxillary and cervical lymphadenopathy (non-tender). In a follow-up examination on February 8, 1994, Locke reported improving night sweats, but increased severity of fatigue and no change in the severity of depression. Locke also reported increasing sleep, and cognitive (memory) problems. Dr. Salvato noted a temperature of 99.8 degrees, red throat, lungs clear to auscultation and percussion, heart regular rate and rhythm, and abdomen soft (non-tender). A review of Locke's medication showed she was prescribed zantac, zovirax, demulen, prozac, reglan, protegra, and oral interferon. (R. 124–130, 162, 191)

On March 3, 1994, Locke reported that her symptoms of fatigue, swollen glands, and depression were "much improved" due to oral interferon. On April 7, 1994, Locke reported no change in night sweats, and severe fatigue requiring 12–15 hours of sleep per day. Locke continued to show a red throat, a low-grade fever of 99 degrees, and mild memory and concentration problems. A laboratory report on April 12, 1994 suggested a reactivated Epstein–Barr virus infection. Dr. Salvato made a diagnosis of Epstein–Barr viral illness and prescribed interferon 10cc BID (20 cc daily). On May 23, 1994, Locke reported improvement in fatigue and night sweats, but symptoms still persisted. Dr. Salvato found no sore throat, muscle or joint pain, or headache, but noted a low-grade fever of 99.3 degrees. She prescribed interferon 15cc BID (30 cc daily). On July 26, 1994, Locke reported improvement of all symptoms, and that now she was working 25 hours per week. Dr. Salvato observed that Locke had a sore throat and low-grade fever of 99.1 degrees. Locke was prescribed interferon 10cc QID (40cc daily). (R. 131–143)

On September 7, 1994, Locke reported that her nausea and night sweats were gone, depression had improved, and she was "somewhat fatigued but nothing like before." Locke stated she had been working 40 hours per week for one month. Her temperature was 98.6 degrees. Dr. Salvato prescribed interferon 25 cc BID (50 cc daily). The next date in the medical record is a checkup on March 6, 1995. Locke reported improvement in depression and stomach pain, but still "needs at least 11–12 hours sleep to function." She stated that she "could not handle being without" the interferon. Dr. Salvato recorded a temperature of 99.7 degrees, noting this was "average for patient." She recorded that Locke's medications included zantac, prozac, demulen, reglan, and interferon. On July 14, 1995, Locke visited Dr. Salvato for a routine checkup, reported being sick all week and unable to go to work. She reported having a heavy migraine headache all week, plus new symptoms of nausea, dizziness, insomnia, and anxiety, and her fatigue had become worse. Dr. Salvato prescribed midrin for her headaches. (R. 144–152).

On August 10, 1995, Dr. Salvato completed a report on her treatment of Locke. She wrote that since December 10, 1992, she had been treating Candice Locke, who

"has a history of Chronic Fatigue Syndrome as based on the CDC criteria of 1988." Dr. Salvato noted that CFS is a disease with frequent exacerbations and remissions, and "may be associated with frequent infections, extreme disturbance, headaches, concentration problems, sleep disturbance, low grade fevers, and muscle and joint pain." She also noted that the disease is "often characterized by elevated Epstein–Barr viral titers." Dr. Salvato further noted Locke's history of intermittent exacerbations of this disease resulting in frequent absences from work and felt Locke would continue to have flare-ups of symptoms "which may render her unable to adequately perform her job duties." Locke protectively filed an application for disability insurance benefits on August 15, 1995. (R.32, 115)

On November 10, 1995, Locke was examined by Dr. Douglas Samuels. Dr. Samuels wrote that in addition to taking interferon for "Epstein–Barr syndrome," Locke was taking zantac for her gastritis, and prozac to treat "depression." Locke also reported that she stopped work in July 1995 due to cold and flu symptoms and being exhausted for a period of six weeks. Dr. Samuels noted that Locke drove herself to the interview in her boyfriend's truck. Dr. Samuels also noted that Locke was neat, cleanly dressed and groomed, cooperative and friendly throughout the interview, and there was no evidence of hypo or hypermotoric activity. Dr. Samuels observed that her affect was calm and mood dysthymic, and concluded there was no evidence of depression or anxiety. In testing Locke's memory, Dr. Samuels noted that Locke could recall her birthdate, and the presidents back to Reagan, recall three objects after five minutes, and repeat five numbers forward and three backward. Dr. Samuels scheduled a second interview in order to complete the concentration and abstracting ability part of the examination, as well as gather more

information on activities of daily living, but Locke failed to follow-up with this appointment. From this information, Dr. Samuels made no Axis I or Axis II diagnosis, and assessed her GAF at 55. (R. 178–181).

On January 23, 1996, Locke was examined by Dr. Larry Flowers. Locke stated that she required a minimum of 14 hours sleep, she was susceptible to colds and viruses, it took her an hour just to get going, her energy level was extremely low, and she gained from 115 to 145 pounds over four years. In the mental status examination, Dr. Flowers noted that her gait was slow, she tried to be pleasant but one could see underlying distress, her psychomotor activity was decreased, mood and affect were depressed, intellectual functioning average, and her insight and judgment slightly impaired. Locke was able to remember the presidents back to Reagan, as well as two of three objects, and she was able to drive herself to the interview. Locke reported that on a given day, she gets up at 7:00 am, makes her son's breakfast, gets back into bed at 7:50am, and stays in bed until noon. Dr. Flowers observed that her concentration, persistence, and pace were decreased at times secondary to her lack of energy, and deterioration and decompensation reveal problems over the past two years. Dr. Flowers diagnosed Locke with "major depressive disorder, recurrent, severe versus mood disorder secondary to chronic fatigue syndrome," and assessed her GAF at 38 to 40. Dr. Flowers further noted that "the patient's prognosis appears poor even in light of the patient being treated with interferon 25 cc b.i.d., prozac 20 mg once a day, and zantac 150 mg b.i.d., she still is not showing remarkable improvement." (R. 182–184).

On February 20, 1996, Dr. Maggie Sedberry conducted a Mental Residual Func-

tional Capacity Assessment of Locke. Dr. Sedberry concluded that Locke suffered from major depressive disorder secondary to chronic fatigue syndrome, but retained basic mental abilities to perform simple, repetitive work. (R.38–43, 46, 50).

On March 25, 1996, Locke began counseling with Sandra Moore, a therapist referred by her psychiatrist, Dr. William Skiba. In an undated letter, Ms. Moore wrote that Locke "can only do several tasks in a day," "often requires a nap of one or two hours in between tasks," and when she "overextends herself she is actually bedridden." Ms. Moore further observed that Locke was extremely motivated and responsive, kept her appointments, appeared sincere in her wish for guidance, "but her energy levels have remained low despite faithful adherence to her medication regime." (R. 194).

On December 4, 1996, Dr. Salvato signed a physician's certification of Locke's total and permanent disability, on behalf of her request for a Department of Education loan cancellation. Dr. Salvato reiterated her diagnosis of Locke's medical condition as Chronic Fatigue Syndrome/Epstein–Barr virus. She stated that Locke "requires frequent rest periods," adding that "her prognosis remains guarded as the most recent CDC statistics show that only about 12% of patients with CFS will fully recover." (R. 192–193). Dr. Salvato repeated her medical opinion in a letter dated April 28, 1997, stating that Locke's symptoms "worsened to the point where she was no longer able to continue to perform job duties," and "her disability status is expected to continue for an indefinite amount of time." Dr. Salvato further noted that "there is no cure for this disease and treatment is basically one of symptomatic measures." (R. 191).

The latest medical entry in the record was made by Dr. Samuel Conklin, who examined Locke on August 12, 1997. Dr. Conklin noted that Locke's chief complaint was "not being able to function like everyone else." Locke stated that this problem began nine years ago, with huge lymph nodes in the groin, axilla, and neck, and with a feeling of a bad flu. The problem has been variable, "some days having not much trouble and other days a lot of trouble." Locke told Dr. Conklin that "if she overexerts herself, she gets 'sick' and she may stay in bed for a month." Locke described the same symptoms noted by Dr. Salvato: swelling lymph nodes, low-grade temperature, night sweats, extreme tiredness, and weight gain. In his physical examination, Dr. Conklin noted there was no lymphadenopathy or icterus, her HEENT was normal, her chest was clear to auscultation, she was able to touch her toes readily, and she had no obvious weakness or fatigue. The CBC was normal "except as noted in the past, eosinophilia." Dr. Conklin reviewed Locke's medical records and stated that the only apparent significant abnormality was eosinophilia. He noted that Locke has had a number of Epstein–Barr virus infections in the past, but decided they did not have any significance with respect to her current problem. When Dr. Conklin examined Locke, he measured her ability to perform the strength requirements of work-related activities, which were within normal limits, and noted "the patient did not demonstrate any wasting, obvious fatigue or shortness of breath. From the medical records and examination, Dr. Conklin concluded 'the patient's problem is chronic fatigue.' He added that while "the patient may have difficulty with work activities based on her fatigue, I have no objective evidence of this." (R. 203–05, 210–12).

### B. Procedural Background—The Administrative Proceedings and Exhaustion of Administrative Remedies

Locke filed an application with the Social Security Administration on August 15,

1995, seeking disability and supplemental security income benefits, claiming an inability to work since July 15, 1995, due to chronic fatigue syndrome and the Epstein–Barr virus. After denial of her applications for benefits following initial and reconsidered determinations, Locke filed a timely request for an administrative hearing. During the hearing on May 28, 1997, at which Locke appeared with Rodney Zwicker, her non-attorney representative, the administrative law judge determined that a current examination by a physician was necessary before a decision was made. At the request of the Texas Rehabilitation Commission, Dr. Conklin examined Locke on August 12, 1997. On November 26, 1997, the ALJ denied Locke's request for benefits. Locke subsequently appealed the denial to the Appeals Council, which affirmed the ALJ's decision on November 18, 1999, rendering the ALJ's determination the final decision of the Commissioner. *See Istre v. Apfel,* 208 F.3d 517, 518 (5th Cir.2000). Locke, therefore, has exhausted all administrative remedies prior to seeking judicial review; and accordingly, the Court has the proper authority by which to commence its review.[3] *See Sims v. Apfel,* 530 U.S. 103, 106, 120 S.Ct. 2080, 147 L.Ed.2d 80 (2000); *Weinberger v. Salfi,* 422 U.S. 749, 757, 95 S.Ct. 2457, 45 L.Ed.2d 522 (1975); *McQueen v. Apfel,* 168 F.3d 152, 155 (5th Cir.1999); *see also* 42 U.S.C. § 405(g); 28 U.S.C. § 1383(c)(3) and 20 C.F.R. § 404.981 and/or 20 C.F.R. § 416.1481 (2000).

## II. ANALYSIS

### A. Motion for Summary Judgment

■ Summary judgment is properly granted if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law, thereby alleviating the necessity, in this instance, of reversing and vacating the administrative decision or of a remand for further administrative proceedings. See Fed.R.Civ.P. 56(c); *Celotex v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Kee v. City of Rowlett, Tex.,* 247 F.3d 206, 210, *reh. denied* (5th Cir. 2001); *Ragas v. Tennessee Gas Pipeline Co.,* 136 F.3d 455, 458 (5th Cir.1998); *Spellman v. Shalala,* 1 F.3d 357, 360 (5th Cir.1993). A factual dispute is "genuine" when a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *PYCA Industries, Inc. v. Harrison County Waste Water Management District,* 177 F.3d 351, 361 (5th Cir.1999); *Crowe v. Henry,* 115 F.3d 294, 296 (5th Cir.1997). The substantive law identifies which facts are "material." *See Duplantis v. Shell Offshore, Inc.,* 948 F.2d 187, 189 (5th Cir.1991). A fact is "material" if its resolution in favor of one party might affect the outcome of the lawsuit under governing law. *Hamilton v. Segue Software Inc.,* 232 F.3d 473, 477 (5th Cir.2000). Where both parties have moved for summary judgment, as to each party's motion, all inferences on summary judgment must be drawn in favor of the nonmoving party, to the extent that if there appears to be some evidentiary support for the disputed allegations, that motion must be denied. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 247; *McAllister v. R.T.C.,* 201 F.3d 570, 574 (5th Cir.2000). Once the summary judgment motion is properly supported, however, the burden shifts from the movant to the adverse party, who may not rest

**3.** This case was referred to the undersigned magistrate judge pursuant to 28 U.S.C. § 636(b)(1), the Cost and Delay Reduction Plan under the Civil Justice Reform Act and Rule 72, Fed R. Civ. P. *See* Order of Referral (Entry # 3).

on mere allegations or denials, but must set forth specific and supported material facts, of significant probative value, to preclude summary judgment. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *International Association of Machinists and Aerospace Workers v. Compania Mexicana de Aviacion, S.A. de C.V.,* 199 F.3d 796, 798 (5th Cir.2000); *Union Planters National Leasing, Inc. v. Woods,* 687 F.2d 117, 119 (5th Cir.1982). Only upon showing that no issues remain as to any material facts, which may be gleaned from reviewing the pleadings, answers to interrogatories, admissions and affidavits on file, will summary judgment be allowed. *Little v. Liquid Air Corp.,* 37 F.3d 1069, 1075 (5th Cir.1994)(*en banc*).

### B. The Administrative Determination

■ Judicial review of the Commissioner's denial of social security benefits is limited to the determination of (1) whether the final decision is supported by substantial evidence and (2) whether the Commissioner used the proper legal standards to evaluate the evidence. *Crowley v. Apfel,* 197 F.3d 194, 197 (5th Cir.1999); *Brown v. Apfel,* 192 F.3d 492, 496 (5th Cir.1999); *Martinez v. Chater,* 64 F.3d 172, 173 (5th Cir.1995)(per curiam). If the Commissioner's findings are supported by substantial evidence, they must be affirmed. *Martinez,* 64 F.3d at 173. Substantial evidence is such relevant evidence as a reasonable mind might accept to support a conclusion. *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971)(*citing Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938)). It is more than a mere scintilla and less than a preponderance of evidence. *Ripley v. Chater,* 67 F.3d 552, 555 (5th Cir.1995). The court does not reweigh evidence in the record, try the issues *de novo,* or substitute its judgment for the Commissioner's, even if the evidence

weighs against the Commissioner's decision. *Brown v. Apfel,* 192 F.3d at 496. Conflicts in the evidence are for the Commissioner and not the courts to resolve. *Id.* A finding of no substantial evidence is appropriate only if no credible evidentiary choices or medical findings support the decision, *Harris v. Apfel,* 209 F.3d 413, 417 (5th Cir.2000), citing *Johnson v. Bowen,* 864 F.2d 340, 343–44 (5th Cir.1988), thereby compelling a "[j]udicial review [that is] deferential without being so obsequious as to be meaningless." *Brown v. Apfel,* 192 F.3d at 496; *Taylor v. Bowen,* 782 F.2d 1294, 1298 (5th Cir.1986).

### C. Determining the Existence of an Eligible Disability

To determine the existence of an eligible disability, there must be an initial evaluation of whether the claimant was unable to perform substantial gainful work existing in the national economy because of a medically determinable physical or mental impairment, which can be expected to result in death, or which has lasted, or can be expected to last, for a continuous period of not less than twelve (12) consecutive months. 42 U.S.C. §§ 416(i). 423(d)(1)(a); *Cleveland v. Policy Management Systems Corp.,* 526 U.S. 795, 797, 119 S.Ct. 1597, 143 L.Ed.2d 966 (1999); *McQueen v. Apfel,* 168 F.3d at 154; *Greenspan v. Shalala,* 38 F.3d 232, 236 (5th Cir.1994), *cert. denied,* 514 U.S. 1120, 115 S.Ct. 1984, 131 L.Ed.2d 871 (1995). A five-step sequential process is utilized by the ALJ to determine whether a claimant qualifies for disability benefits. *See* 20 C.F.R. § 404.1520(b)-(f) (1998); *Leggett v. Chater,* 67 F.3d 558, 563 (5th Cir.1995). The claimant has the burden of establishing the first four steps of the five-step sequential process by establishing that he has a severe impairment, which prevents her from performing her past relevant work. If, at any step of the analysis, the ALJ finds that the claimant is

or is not disabled, the inquiry is terminated. *Bowen v. Yuckert*, 482 U.S. 137, 146 n. 5, 107 S.Ct. 2287, 96 L.Ed.2d 119 (1987); *Myers v. Apfel*, 238 F.3d 617 (5th Cir. 2001). If the claimant acquits this responsibility, the burden shifts at step five to the Commissioner, who must show that other gainful employment exists which the claimant is capable of performing in spite of his existing impairments. *Carey v. Apfel*, 230 F.3d 131, 135 (5th Cir.2000). If the Commissioner meets this burden, the claimant must then prove she in fact cannot perform the alternate work. *Id.* In this five-step process, the ALJ considers:

1) whether the claimant is currently engaged in substantial gainful activity, as an individual who is currently engaged in substantial gainful activity will not be found disabled, regardless of the medical findings;

2) whether the claimant has a severe impairment;

3) whether the claimant meets or equals a listed impairment in 20 C.F.R. Part 404, Subpart P, Appendix 1, as such an individual will be considered disabled without consideration of vocational factors;

4) if an individual is capable of performing the work he or she has done in the past, a finding of not disabled must be made; and

5) if an individual's impairment precludes him or her from performing his or her past work, other factors, including age, education, past work experience and residual functional capacity must be considered to determine if there is any work in the national economy that the individual can perform.

20 C.F.R. § 404.1520(b)-(f); see *Carey v. Apfel*, 230 F.3d at 134–135 (5th Cir.2000); *Brown v. Apfel*, 192 F.3d at 498; *Leggett v. Chater*, 67 F.3d 558, 566 (1995).

## III. DISCUSSION

### A. The ALJ Gave Improper Weight to the Medical Evidence, in Particular the Treating Physician's Medical Opinion

The Commissioner's regulations set forth a five-step sequential process for determining whether a legal disability exists. The ALJ's findings that Locke did not engage in substantial gainful activity during the period in question, that the medical evidence establishes that the plaintiff has severe impairments, and that the impairments are not listed or medically equal to one listed, are not in dispute. At the fourth step, the ALJ concluded that Locke had the work capacity to perform her past relevant work. Locke contends that the ALJ improperly rejected the opinion of her treating physician, relying instead on the opinion of a one-time consultative examiner, to reach this conclusion.

The Fifth Circuit has long held that ordinarily the opinions, diagnoses, and medical evidence of a treating physician who is familiar with the claimant's injuries, treatments, and responses should be accorded considerable weight in determining disability. *Myers*, 238 F.3d at 621; *Scott v. Heckler*, 770 F.2d 482, 485 (5th Cir. 1985). A treating physician's opinion on the nature and severity of a patient's impairment will be given controlling weight if it is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence. *Martinez*, 64 F.3d at 176 (citing 20 C.F.R. § 404.1527(d)(2)). The opinion of a specialist generally is accorded greater weight than that of a non-specialist. *Newton v. Apfel*, 209 F.3d 448, 453 (5th Cir.2000).

Though the opinion and diagnosis of a treating physician should be afforded considerable weight in determining disabil-

ity, the ALJ has sole responsibility for determining a claimant's disability status and is free to reject the opinion of any physician when the evidence supports a contrary conclusion. *Newton,* 209 F.3d at 453; *Martinez,* 64 F.3d at 176. When good cause is shown, the ALJ may give less weight, little weight, or even no weight to a physician's testimony. *Greenspan,* 38 F.3d at 237. The good cause exceptions include disregarding statements are brief and conclusory, not supported by medically acceptable clinical, laboratory, or diagnostic techniques, or otherwise unsupported by the evidence. *Id.*

The Fifth Circuit recently held that, absent reliable medical evidence from a treating or examining physician controverting the claimant's treating specialist, an ALJ may reject the opinion of the treating physician *only* if the ALJ performs a detailed analysis under the criteria set forth in 20 C.F.R. § 404.1527(d)(2). *Newton,* 209 F.3d at 453 (5th Cir.2000). This regulation requires consideration of (1) the physician's length of treatment of the claimant, (2) the physician's frequency of examination, (3) the nature and extent of the treatment relationship, (4) the support of the physician's opinion afforded by the medical evidence of record, (5) the consistency of the opinion with the record as a whole; and (6) the specialization of the treating physician. *Id.*

▇ This regulation has been interpreted under Social Security Ruling ("SSR") 96–2p, which states that "[a] finding that a treating source's medical opinion is not well supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to 'controlling weight,' not that the opinion should be rejected. Treating source medical opinions are still entitled to deference and must be weighed using all of the fac-

tors provided in 20 C.F.R. § 404.1527 and 416.927." SSR 96–2p, 61 F.R. 34490, 34491 (July 2, 1996). The Social Security Administration's rulings are not automatically binding on this court, but may be consulted when the statute at issue provides little guidance. *Myers,* 238 F.3d at 620. The Fifth Circuit has frequently relied upon its rulings in evaluating ALJs' decisions. *Id.* Specifically, the Fifth Circuit in *Newton* adopted SSR 96–2p, and ordered a remand where the ALJ had failed to analyze the treating physician's opinion under § 404.1527(d) factors before declining to give it any weight, and instead, had chosen to rely expressly on the opinion of a non-treating physician. *Newton,* 209 F.3d at 456–57.

The ALJ, in discounting Dr. Salvato's opinion, explained that her "evaluation is based for the most part on subjective complaints." (T. 17). The ALJ further noted that while the reports of Dr. Salvato, the treating physician, and Dr. Larry Flowers, were in direct conflict with those of Dr. Douglas Samuels and Dr. George Conklin, they were not supported by any more objective evidence than the opinions of Dr. Samuels and Dr. Conklin. (T. 17). The Commissioner, in his motion, asserts that Dr. Salvato's opinions "lack acceptable clinical and laboratory techniques showing a debilitating chronic fatigue syndrome." But this view is not expressed by the ALJ in her decision, nor does the Commissioner support it with specific references to the record. The Commissioner argued instead that while Dr. Salvato wrote she had followed the Centers for Disease Control (CDC) criteria in diagnosing CFS, she did not state the criteria or match it to Plaintiff's medical facts. *Defendant's Motion for Summary Judgment,* p. 3. This claim is both inaccurate and inconsequential. The list of symptoms needed to diagnose CFS are clearly stated in her August 10, 1995 letter (R. 115). The doctor's treatment

notes show that Locke did suffer from these symptoms (frequent infections, extreme fatigue, low-grade fevers, and so forth). But the Commissioner does not actually rebut the diagnosis of CFS, other than to claim a lack of evidence or acceptable clinical techniques. Dr. Salvato's uncontradicted statement that she followed the CDC criteria of 1988, which can be found in the *Annals of Internal Medicine*, Vol. 108, Jan.-March 1988, p. 387–89, is sufficient. See *Sisco v. U.S. Dept. of Health and Human Servs.*, 10 F.3d 739 (10th Cir.1993) (Treating physician's unrebutted statement, in response to interrogatories, that plaintiff met the criteria for the disease established by the CDC was acceptable clinical technique to confirm CFS as medical fact.) More likely, the ALJ declined to give controlling weight to Dr. Salvato's opinion because it was "in direct conflict" with Dr. Conklin's opinion, and therefore inconsistent with the other substantial evidence in the case record.

■ The ALJ erred in not showing deference to the medical opinion of Dr. Salvato, Locke's treating physician. While the ALJ may give little or even no weight to a physician's testimony when it is inconsistent with other evidence, *Greenspan*, 38 F.3d at 237, a treating physician's medical opinion is still entitled to deference through consideration of all of the factors provided in 20 C.F.R. § 404.1527(d)(2). *Newton*, 209 F.3d at 453. The ALJ did not perform a detailed analysis of Dr. Salvato's testimony using the regulatory criteria required by the Fifth Circuit. The ALJ did not consider, among other factors, the length of treatment by Dr. Salvato, her frequency of examination, or her medical specialization.

The record shows that on August 10, 1995, Dr. Salvato wrote a letter stating that Locke had been a patient under her care since December 10, 1992 (R. 115). The patient's progress notes indicate that during this period, Dr. Salvato examined Locke at least eighteen (18) times (R. 116–152). In a April 28, 1997 letter, Dr Salvato described Locke as "a patient under my care for Chronic Fatigue Syndrome" (R. 191). At the ALJ hearing one month later, Locke testified that her current doctor was Dr. Salvato, that the doctor last examined her in November 1996, at which time she was referred to her obstetrician-gynecologist due to her pregnancy (T.11, R. 228). The record clearly shows that Dr. Salvato treated the plaintiff for four years. In contrast, Dr. Conklin was a consultative examiner who saw Locke once. The plaintiff also asserts that Dr. Salvato has a 41 page Curriculum Vitae outlining her extensive background on the subject of CFS and other immune system disorders. *Plaintiff's Motion for Summary Judgment*, p. 6. Locke, however, fails to refer specifically to where the record supports this extensive background. On the other hand, the ALJ had a duty to develop the record fully and fairly. *Ripley*, 67 F.3d at 557. In particular, the ALJ must consider the six factors of 20 C.F.R. § 404.1527(d)(2), including "specialization of the treating physician," an impossible task if the ALJ has not attempted to ascertain Dr. Salvato's specialization. The ALJ, in evaluating a treating physician's medical opinion, must consider the criteria set forth in 20 C.F.R § 404.1527(d)(2), before rejecting that opinion. Failure to meet this legal standard constitutes an error requiring remand.

**B. The ALJ Improperly Assessed the Plaintiff's Residual Functional Capacity and Erred in Rejecting the Claimant's Subjective Complaints**

Social Security regulations define residual functional capacity (RFC) as the maximum degree to which the individual retains the capacity for *sustained* performance of the physical mental require-

ments of jobs. 20 C.F.R. § 404, Subpt. P, App. 2 § 200.00(c) (emphasis added). The RFC evaluation is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis. *Myers*, 238 F.3d at 620 (citing SSR 96–8p, 1996 WL 374184, *1). The RFC tests both exertional and non-exertional factors, the former involving seven strength demands: sitting, standing, walking, lifting, carrying, pushing, and pulling. *Id.* The individual's capacity to perform the seven strength demands on a regular, continuing basis must also be stated. *Id.*, (citing SSR 96–9p, 1996 WL 374185, *2).

The Fifth Circuit has reviewed, in a brief unpublished opinion, one Social Security case where CFS was claimed as a reason for legal disability. See *Moss v. Apfel*, No. 98–20215, 172 F.3d 869(Table), 1999 WL 130146 (5th Cir. February 12, 1999). The court affirmed the Commissioner's denial of benefits for a plaintiff who did not seek treatment for any CFS symptoms while she was insured, and offered no retrospective doctor opinion to show that she suffered from CFS during that time period. *Id.* Our case is distinguishable because Locke did seek treatment for her symptoms while insured, and her treating physician stated that her CFS existed during the time she was insured. Furthermore, the ALJ in the earlier case had rejected a diagnosis of CFS, adopting instead a diagnosis of hysterical neurosis. In contrast, the ALJ in our case did not adopt an alternate diagnosis in place of CFS.

Recently, a number of federal court cases have evaluated chronic fatigue syndrome in relation to the social security disability analysis. The Ninth Circuit recently decided a claim for disability based on chronic fatigue syndrome. In *Reddick v. Chater*, 157 F.3d 715 (9th Cir.1998), the claimant was diagnosed with CFS by her treating physicians, but the ALJ relied exclusively on two consultative examiners to find her capable of returning to past relevant work. The court held that the ALJ erred by failing to take into account the debilitating effects of CFS when making his determination, at step four, that the claimant had the residual capacity to perform her past work. *Id.*, at 724. The court stated that "[a]lthough the ALJ found that 'the medical evidence establishes that Claimant had chronic fatigue syndrome,' the ALJ's evaluation of functional capacity ignored the key symptom of CFS, which is persistent fatigue." *Id.* Neither consultative examiner assessed the claimant's capacity for sustained work. *Id.* One doctor found no limitation in the claimant's capacity to sit, stand, walk, and lift up to 20 pounds, evaluating claimant's ability to work based only on those orthopedic factors; the other, a psychologist, administered the standard psychological tests and, finding no major social deficits, concluded the claimant could return to an forty-hour work week. *Id.* The court held that because the ALJ's RFC evaluation "failed to address claimant's ability to undertake sustained work activity, his analysis did not comport with the Social Security Administration's regulatory requirements." *Id.*

As in *Reddick*, the ALJ in this case found that Locke had the "severe" impairment of chronic fatigue syndrome, but failed to consider the evidence of her persistent fatigue when concluding that she could perform full-time sedentary work on a consistent and ongoing basis. The ALJ relied on the reports of two consultative examiners, Drs. Conklin and Samuels, but they administered the same type of exertional and psychological tests give by the doctors in the *Reddick* case, and which that court concluded did not

assess the plaintiff's ability to perform sustained work. Consequently, the ALJ's RFC evaluation does not comport with social security regulations. Also similar to *Reddick* is the ALJ's rejection of the treating physician's medical opinion in favor of a non-treating physician's opinion. The Commissioner, in his memorandum, contends that the ALJ decided correctly that Locke's subjective complaints lacked credibility due to a lack of objective, medical evidence, and that even Dr. Salvato's evaluation is based for the most part on subjective complaints. (R. 17). But The ALJ's reasoning runs counter to the CDC's published framework for evaluating and diagnosing CFS. Chronic fatigue is defined as "*self reported* persistent or relapsing fatigue lasting six or more consecutive months." *Reddick* 157 F.3d at 726 (citing Centers for Disease Control, The Chronic Fatigue Syndrome: A Comprehensive Approach to its Definition and Study, 121 *Annals of Internal Medicine* 954 (1994)).[4] Locke's complaints and Dr. Salvato's evaluation cannot be discounted simply due to their subjective basis, when the disease's main symptom, persistent fatigue, is necessarily self-reported. Furthermore, because the methods for diagnosing chronic fatigue syndrome are limited, the credibility of the claimant's testimony regarding her symptoms takes on "substantially increased" significance in the ALJ's evaluation of the evidence. *Fragale v. Chater*, 916 F.Supp. 249, 254 (W.D.N.Y.,1996).

The Sixth Circuit also recently decided a disability claim based on CFS and other disorders. In *Buxton v. Halter*, 246 F.3d 762, 763–64 (6th Cir.2001), the ALJ found that the claimant suffered from severe but non-disabling impairments of CFS, chemical sensitivity syndrome, depression, and somatoform disorder. Unlike *Reddick*, the claimant's treating physician concluded that despite CFS she was "fully capable of performing" work-related activities, and even questioned the diagnosis of CFS itself. *Id.*, at 765–767. In fact, only one out of nine medical experts who examined the claimant, including two Social Security examiners, concluded that she was "unable to perform [at] a functional level of output" due to CFS. *Id.*, at 768. Also distinguishable from *Reddick* is the claimant's somatoform disorder (i.e.,she was a hypochondriac), which called into question her subjective complaints of CFS and chemical sensitivity syndrome. *Id.*, 770. A third feature distinguishing *Buxton* is that the claimant does not argue the ALJ failed to consider her exertional limitations, but instead that the court should consider her mental perceptions of her ailments and limitations, regardless of whether they are correct or mistaken. *Id.*, 771, 775. Finally, even the claimant's own accounts of her activities and limitations are conflicting. *Id.*, 775.

For the reasons stated above, the present case is also materially distinguishable from *Buxton*. First, Dr. Salvato's diagnosis of disability based on CFS confirmed Locke's subjective complaints of extreme fatigue. Second, no medical expert opined that Locke exhibited hypochondria, malingering, or any other behavior that would call her credibility into question. Third,

4. The International Chronic Fatigue Syndrome Study Group has developed similar guidelines, describing CFS as a "a clinically defined condition characterized by severe disabling fatigue and a combination of symptoms that prominently features self-reported impairments in concentration and short-term memory, sleep disturbances, and musculo- skeletal pain." *Fragale v. Chater*, 916 F.Supp. 249, 253 (W.D.N.Y.1996) (citing Fudka, Straus, Hickie, Sharpe, Dobbins and Komaroff, The Chronic Fatigue Syndrome: A Comprehensive Approach to Its Definition and Study, Annals of Internal Medicine, Vol. 121, No. 12, pp. 945–59 (Dec. 15,1994))

Locke argued her case on a completely different basis—that the ALJ failed to consider her exertional limitations, especially fatigue. Lastly, the ALJ's decision does not express the view that Locke's own accounts are conflicting, rather than consistent.

The ALJ did conclude, however, there was "very little objective evidence" to support the Locke's complaints, but in fact Dr. Salvato recorded several objective and physical symptoms associated with CFS.[5] CFS is defined as "persistent debilitating fatigue of recent onset, with reduction of physical activity to less than half of usual, accompanied by some combination of muscle weakness, sore throat, mild fever, tender lymph nodes, headaches, and depression, with the symptoms not attributable to any other known causes." *Dorland's Illustrated Medical Dictionary* 1627 (28th ed.1994). Locke exhibited objective symptoms of sore red throat, mild fever around 99 degrees, and tender lymph nodes since at least December 1993 (125–152, 195). The record also indicates she has taken prozac for depression since February, 1994. (R. 129, 179). The ALJ's conclusion that little objective evidence supports Locke's complaints is unsupported by the record.

The Commissioner correctly states that how much pain or discomfort is disabling is a question for the ALJ, since the ALJ has primary responsibility for resolving conflicts in the evidence. *Carrier v. Sullivan* 944 F.2d 243, 247 (5th Cir. 1991). While the ALJ must consider subjective evidence, it is within the ALJ's discretion to determine its debilitating na-

ture and these determinations are entitled to considerable deference. *Jones v. Bowen,* 829 F.2d 524, 527 (5th Cir.1987). The Commissioner also argues that the absence of medical factors can itself justify the ALJ's determination regarding pain. The ALJ is entitled to give preference to medical evidence over the claimant's own testimony. *Falco v. Shalala,* 27 F.3d 160, 163 (5th Cir.1994). But as in *Reddick,* the ALJ emphasized pain and its effect on Locke's activities, rather than *fatigue,* which is the basis of her disability claim. 157 F.3d at 727. In stating the criteria for evaluating subjective complaints, the ALJ repeatedly mentions "pain or other symptoms," but cites no rules governing the evaluation of fatigue. Specifically, the ALJ failed to consider the Program Operations Manual System ("POMS") guidelines on CFS issued by the Social Security Administration in 1993, and applied by the Ninth Circuit in *Reddick.* The POMS guidelines state, in pertinent part:

> "CFS is characterized by the presence of persistent unexplained fatigue and by the chronicity of other symptoms. The most prevalent symptoms include episodes of low-grade fever, myalgias, headache, painful lymph nodes, and problems with memory and concentration. *These symptoms fluctuate in frequency and severity and may be seen to continue over a period of many months. Physical examination may be within normal limits.* Individual cases must be adjudicated on the basis of the totality of the evidence, including the clinical course from the onset of the illness,

---

**5.** The ALJ is vague on whether "very little objective evidence" refers solely to the plaintiff's ability to perform work-related activities, or to the diagnosis of CFS as well. The decision intimates a reluctant acceptance of the diagnosis. The ALJ's conclusion does not mention CFS, only that plaintiff suffers from "severe impairments." CFS can be a very

debilitating disease with symptoms out of proportion with any objective evidence, *Rose v. Shalala,* 34 F.3d 13, 19 (1st Cir.1994), and the ALJ's ultimate conclusion of sustained work ability might he different if her intermediate conclusion about CFS was different. *Abdus-Sabur v. Callahan,* 181 F.3d 79, 1999 WL 551133 (1st Cir.1999) (unpublished opinion).

symptoms, signs, and laboratory findings. Consideration should be given to onset duration, severity and residual functional capacity following the sequential evaluation process".

POMS § DI 24575.005 (1993) (emphasis added)

The Commissioner asserts that the medical evidence affirmatively supported an ability to work because, as the ALJ observed, Dr. Samuels believed that Locke could travel to unfamiliar places, prepare meals, shop, communicate and interact with others, and complete tasks in a timely manner, and Dr. Conklin found no significant reduction in Locke's physical ability to perform work related activities (R. 18). But if the ALJ considered the POMS guidelines, she might have observed that symptoms of CFS fluctuate in severity and frequency, and a physical examination could be within normal limits. The ALJ is entitled to give medical evidence preference over the claimant's testimony, but the guidelines suggest that the medical evidence from two one-time consultative examiners and the plaintiff's subjective testimony do not necessarily conflict.

■ Finally, the Commissioner contends that credible medical evidence suggested that plaintiff's claims of discomfort were exaggerated and that the ALJ elected to discount her testimony for this reason. See *Defendant's Motion for Summary Judgment*, p. 7. No examining doctor reported a belief or suspicion that Locke's symptoms were exaggerated, nor did the ALJ express such an belief in her decision. CFS can be a very debilitating disease with symptoms out of proportion with any objective evidence. *Rose*, 34 F.3d at 19 (1st Cir.1994). As a result, the ALJ should not have discredited her testimony. If the ALJ had considered limitations related to fatigue in assessing the plaintiff's residual functional capacity, she may have found the plaintiff's testi-

mony to be fully credible. The ALJ's decision also should have considered the variable nature of CFS symptoms, and followed the Social Security Administration's own POMS guidelines in evaluating disability based on CFS. The ALJ failed to do so, and therefore did not apply the proper legal standard.

### C. The ALJ Properly Found that the Plaintiff Did Not Have a Severe Mental Impairment.

The burden of showing severity of the impairment is mild and the plaintiff need show only that her impairment is not so slight and its effect is not so minimal, *McDaniel v. Bowen*, 800 F.2d 1026, 1031 (11th Cir.1986), albeit one that significantly limits your physical or mental ability to do basic work activities. C.F.R. 404 § 1520. The plaintiff argues that since her major depression, as diagnosed by Dr. Flowers, has more than a "minimal" effect on her ability to function, the ALJ should have found this impairment to be "severe."

■ The ALJ has the ability to resolve conflicts in the medical evidence. *Richardson*, 402 U.S. at 399, 91 S.Ct. 1420; *Jenkins v. Chater*, 76 F.3d 231, 233. In this case, the ALJ examined the evidence and resolved a conflict between two consultative psychiatric examiners as she was empowered to do. In her decision, the ALJ discussed the psychiatric evidence on record, but did not find that the plaintiff had a "severe" mental impairment. Dr. Flowers, one of the psychiatric consultative examiners hired by the Social Security Administration, had opined that Locke had "severe" major depression with a Global Assessment of Functioning ("GAF") of 38–40 (R. 182–184). Dr. Samuels, on the other hand, saw no evidence of depression or anxiety and made no diagnosis on either Axis I or II. Additionally, Dr. Samuels concluded that Locke had a GAF of 55 (R.

179–181).[6] The medical evidence provided two conflicting views of Locke's mental abilities. The ALJ noted that Dr. Flowers' evaluation of Locke conflicted with that of Dr. Samuels, and concluded that there was no real objective evidence to support a significant reduction in her ability to perform work-related activity as a result of her depression, which appeared to be situational. (R. 12–13, 17). In this case, the ALJ's decision not to consider Locke's mental impairment as "severe" was supported by substantial evidence and represented a correct application of legal standards.

### IV. CONCLUSION

After a careful review, the Court finds that the decision of the ALJ is unsupported by substantial evidence, and that the Commissioner did not adhere to proper legal standards in evaluating the evidence. The ALJ in this instance improperly determined that Locke is not disabled within the purview of the Act, pursuant to consistent regulatory criteria. Accordingly, the ALJ's decision that Locke retains the residual functional capacity to perform past relevant work must be remanded, pursuant to 42 U.S.C. § 405(g) sentence four, to the Commissioner, to re-evaluate Dr. Salvato's medical opinion in accordance with regulatory criteria, consider the proper guidelines for CFS disability, and conduct further findings and/or proceedings not inconsistent with this opinion. It is therefore

**ORDERED** that Locke's Motion for Summary Judgment (Entry #21) is **GRANTED**.

Further it is

**ORDERED** that the Commissioner's Motion for Summary Judgment (Entry #22) is **DENIED**.

Finally it is

**ORDERED** that the decision of the Commissioner is **REMANDED**. Therefore, final judgment shall be entered accordingly.

The Clerk of the Court shall file this Memorandum and Order and provide the parties with a true copy.

---

6. The DSM–IV p. 32 (4th ed.1994), describes a GAF score of 51–60 as an overall level of functioning in which there are "moderate symptoms, or moderate difficulty in social, occupational, or school functioning."